UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

SECURITIES AND EXCHANGE COMMISSION, )
)
Plaintiff, )
)
v. )
)
JOSEPH A. RUBBO, ANGELA RUBBO MONACO )
BECKCOM, and STEVEN J. DYKES, )
)
Defendants )
)
_____ )

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

### I. INTRODUCTION

1. From no later than January 2013 through April 2017, Defendants Joseph A. Rubbo ("Rubbo") and Angela Rubbo Beckcom Monaco ("Monaco") operated a scheme in which they offered and sold investments and/or issued restricted shares of stock in VIP TV, LLC, VIP Television Inc., and The Spongebuddy, LLC (collectively "VIP") to at least 11 investors nationwide and raised at least $5.4 million.

2. Rubbo and Monaco, SEC recidivists previously enjoined from similar misconduct in 2002 actions, controlled VIP. They hired Defendant Steven J. Dykes, an unregistered broker with a criminal history, to cold call investors and pitch investments in VIP.

3. Monaco falsely represented that VIP would become profitable by using investors' proceeds to develop the VIP businesses. Instead, Rubbo and Monaco misappropriated investor funds and paid themselves and related parties more than $2.6 million. Rubbo and Monaco

further paid Dykes more than $568,000, including at least $150,000 in undisclosed sales commissions.

4. As a result of the conduct alleged in this Complaint Defendants Rubbo and Monaco violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)] (as to Rubbo Sections 17(a)(1) and (3) only); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)]; and Exchange Act Rule 10b-5 [17 C.F.R. §240.10b-5] (as to Rubbo, Rules 10b-5(a) and (c) only). Defendant Dykes violated Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)] and Defendants Rubbo and Monaco aided and abetted Dykes's violations of Section 15(a) of the Exchange Act. Unless restrained and enjoined, the Defendants are reasonably likely to continue to violate the federal securities laws.

## II. DEFENDANTS AND RELEVANT ENTITIES

5. Rubbo, age 54, resides in Coral Springs, Florida. He was a manager of ANJ Productions, LLC, and The Spongebuddy, LLC, originally located in Fort Lauderdale and Oakland Park, Florida. Rubbo served as the public face of VIP TV, attending premieres at entertainment venues and touting VIP TV's success at promoting local merchants and events, also appearing in many of the hundreds of videos VIP TV provided through its YouTube channel. In October 2017, the U.S. Attorney's Office for the District of Colorado charged Rubbo with conspiracy to commit mail fraud, securities fraud, and money laundering related to among other things, the VIP investments (*U.S. v. Rubbo et al.*, Case No. 17-cr-411-RBJ). In 2002, the U.S. Attorney's Office for the Southern District of Florida charged Rubbo with racketeering, money laundering, and mail and wire fraud for his conduct in connection with a boiler room operation (*U.S. v. Graziano, et al.*, Case No. 02-60049 cr-Hurley). In 2003, Rubbo pled guilty to conspiracy to commit racketeering and was sentenced to 52 months incarceration,

three years of supervised release, and ordered to pay $8,158,660 in restitution. In 2002, the Commission brought an action against Rubbo in the Southern District of Florida in an unrelated case involving a boiler room fraud (*SEC v. Make It Reel Productions, Inc., et al.*, Case No. 02-60255-CV-Graham) (the "*Make it Reel* case"). Rubbo consented to the entry of a final judgment enjoining him from antifraud and securities registration violations in connection with that case. Rubbo is not, and was not at the time of the conduct described herein, registered with the Commission as a broker or dealer or associated with one.

6. Monaco, age 45, resides in Coral Springs, Florida. Monaco, who is Rubbo's sister, was the Managing Member of ANJ Productions, LLC, VIP TV, LLC, and The Spongebuddy, LLC, which were located in Oakland Park, Florida, and shared space. Monaco founded VIP and Spongebuddy, and along with Rubbo controlled and had signatory power over the companies' bank accounts. Monaco directly solicited investors and discussed the investment opportunities with potential investors. She signed numerous investment agreements for the VIP investment opportunities. In November 2017, the U.S. Attorney's Office for the District of Colorado charged Monaco with mail fraud, securities fraud, money laundering, and conspiracy to commit mail fraud and wire fraud related to among other things, the VIP investments (*U.S. v. Monaco, Dykes, et al.*, Case No. 17-cr-417-PAB) (the "Monaco and Dykes Criminal Case"). In 2002, the Commission brought action against Monaco in the *Make it Reel* case. Monaco consented to the entry of a final judgment enjoining her from antifraud and securities registration violations in connection with that case. Monaco is not, and was not at the time of the conduct described herein, registered with the Commission as a broker or dealer or associated with one.

7. Dykes, age 61, resides in Fort Lauderdale, Florida. Dykes was the sales agent who initially solicited most of VIP's investors. In November 2017, the U.S. Attorney's Office

for the District of Colorado charged Dykes with mail fraud, securities fraud, money laundering, and conspiracy to commit mail fraud and wire fraud in the Monaco and Dykes Criminal Case. In 2012, Dykes pled guilty to charges of grand theft brought in state court in Broward County, Florida, and is serving probation for these offenses until April 2023. Dykes is not, and was not at the time of the conduct described herein, registered with the Commission as a broker or dealer or associated with one.

8.     In April 2014, Rubbo, Monaco, and Dykes entered into a Consent Order with the Illinois Securities Department, prohibiting each of them and VIP from offering or selling securities to Illinois residents.

9.     ANJ Productions, LLC, is an inactive Florida limited liability company formed in 2011, with its principal place of business in Oakland Park, Florida. ANJ operated under the fictitious name "VIP TV", served as the parent entity to all the VIP entities and other related entities controlled by Rubbo and Monaco. Both Rubbo and Monaco had signature authority over ANJ's bank accounts. In September 2017, ANJ Productions, LLC was administratively dissolved for failure to file an annual report.

10.    VIP TV, LLC, is an inactive Florida limited liability company formed in 2012 with its principal place of business in Fort Lauderdale, Florida. VIP TV was purportedly in the business of marketing and promoting entertainment events and venues such as nightclubs, restaurants, exercise facilities and other South Florida businesses through televised segments and infomercials broadcast on a local cable television channel and its YouTube channel. Rubbo was the executive producer at VIP TV and, along with Monaco, had control over VIP TV's bank accounts, activities and videos. In 2013, VIP TV was administratively dissolved by the state of

4

Florida; however the proposed defendants continued to transact business and offer investments in this entity's name through at least 2016.

11. VIP Television Inc., is a Florida corporation with its principal place of business in Oakland Park, Florida. Monaco formed VIP Television in 2010 and served as its President and CEO. Monaco signed investment agreements and issued share certificates to investors on behalf of VIP Television.

12. The Spongebuddy, LLC, is an inactive Florida limited liability company formed in 2013 with its principal place of business in Oakland Park, Florida. Both Rubbo and Monaco had signature authority over the Spongebuddy's bank accounts. Spongebuddy was purportedly in the business of developing and manufacturing the Spongebuddy product, a glove-like sponge patented in September 2014. The Spongebuddy would allegedly be sold via the QVC cable channel and retailers such as Walgreen's and Bed, Bath and Beyond. In September 2017, The Spongebuddy, LLC was administratively dissolved for failure to file an annual report.

13. VIP TV Limo, LLC, is an inactive Florida limited liability company formed in 2013 with its principal place of business in Oakland Park, Florida. Monaco formed VIP TV Limo and served as its Manager. Both Rubbo and Monaco had signature authority over VIP TV Limo's bank accounts which received investor funds. In September 2017, VIP TV Limo was administratively dissolved for failure to file an annual report.

14. VIP's securities are penny stocks because they do not fit within any of the exceptions from the definition of "penny stock," as defined by Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder. Among other things, they were equity securities: (1) that were not an "NMS stock," as defined in 17 CFR 242.600(b)(47); (2) traded below five dollars per share during the relevant period; (3) whose issuers had net tangible assets and average revenue

below the thresholds of Rule 3a51-1(g)(1); and (4) did not meet any of the other exceptions from the definition of "penny stock" contained in Rule 3a51-1 under the Exchange Act. The Defendants participated in the offering of penny stock by soliciting investors for VIP (Monaco and Dykes) and/or paying Dykes transaction-based compensation to sell penny stocks to investors (Monaco and Rubbo).

### III. JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)]; and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

16. This Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Florida because many of the acts and transactions constituting the violations alleged in this complaint occurred in this District. Moreover, the Defendants reside in the Southern District of Florida and VIP had its principal offices in this District which the individual Defendants worked from.

17. In connection with the conduct alleged in the Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in the interstate commerce, and of the mails.

### IV. FACTUAL BACKGROUND

18. Starting in 2013, Monaco and Dykes, who was VIP's lead sales agent, contacted prospective investors, many of whom were elderly and unsophisticated, via cold-calls and in-person meetings to invest in the VIP offerings.

19. VIP offered investors two investment products: restricted shares of stock and investment agreements with a fixed rate of return.

20. The investment agreements varied, but essentially required an investment of money with a return tied to the gross revenues generated by VIP's businesses. In all instances management retained control of the companies and business decisions.

21. Monaco and sales agents, including Dykes, told investors that VIP's investment program was entirely passive and would generate returns from revenue generated from each of the companies.

22. VIP provided investors information that the value of their investments would increase through the success of the VIP businesses and the potential sale of VIP to larger companies.

23. Dykes told VIP's largest investor that the Starz cable channel and Pandora Radio were both interested in buying VIP and would "roll-up" VIP into these entities. VIP's largest investor decided to continue investing with VIP based on these representations and the expectation that he would sell his stock for a profit.

24. Similarly, sales agents, as well as Monaco, told the same investor that the Spongebuddy product was in the last stages of development, would be featured on the television show "Shark Tank," marketed on the QVC cable television channel, as well as sold at Walgreens and Bed, Bath and Beyond.

25. VIP's largest investors, who are elderly, entered into 10-year agreements with VIP, which entitled investors to 10% of VIP's quarterly profit from selling the Spongebuddy product and 40% of the annual profit. These same investors entered into similar agreements to

purchase revenue interests that paid quarterly returns, as well as restricted shares of VIP TV stock.

26. Monaco signed the agreements which specified that VIP's management made all decisions with respect to the development of the business and the marketing of its services or products and the "investor shall act as an investor only" with no active participation in the company business.

27. From January 2013 through April 2017, VIP raised approximately $5.4 million from 11 investors.

### V. Misrepresentation to Investors and Scheme Conduct

28. Monaco orally and in agreements distributed to investors, as well as through directing Dykes's sales efforts to investors, made misrepresentations that investor funds would be used to benefit the VIP companies.

29. Based on Monaco's and Dykes's representations to investors, as well as the investment agreements signed by Monaco, investors believed their funds were being used to improve and expand the entertainment promotions business, and to manufacture, distribute, and sell the Spongebuddy product.

30. Contrary to these representations, Rubbo and Monaco did not use the vast majority of investor funds for business operations. Instead, investor monies flowed into bank accounts of ANJ Production, LLC, The Spongebuddy, LLC, and VIP TV Limo, LLC, and were controlled by Rubbo and Monaco who misappropriated a substantial amount of funds and paid undisclosed commissions.

31. Rubbo and Monaco used investor proceeds to pay approximately $2.6 million to insiders and related parties, including approximately: $632,000 to Rubbo; $621,500 to Monaco; and $1,306,000 to relatives.

32. Rubbo and Monaco also paid at least $568,000 to Dykes, at least $150,000 of which was undisclosed commissions directly related to investor sales.

33. Additionally, and as part of their fraudulent scheme, Rubbo and Monaco commingled investor monies and used investor funds for personal use, to pay expenses such as restaurants, retail stores, the down payment for a luxury vehicle, credit card bills, and for other expenses such as to pay $15,000 to the IRS on behalf of related parties.

34. Rubbo and/or Monaco also made payments to unrelated business ventures for purported construction work, as well as a contractor's business licensure, and financed a used car lot operated by Rubbo's brother-in-law and Monaco's husband.

35. Additionally, Rubbo and/or Monaco diverted funds for the benefit of family members, including their brothers, mother, nieces and nephews.

36. While Rubbo and Monaco misappropriated millions of dollars in compensation and commissions to themselves and others from 2014 through April 2017, VIP paid only approximately $56,000 in returns to investors.

### COUNT I

### VIOLATIONS OF SECTION 17(a)(1) OF THE SECURITIES ACT
### (Against Rubbo and Monaco)

37. The Commission repeats and realleges Paragraphs 1 through 36 of this Complaint as if fully set forth herein.

38. From no later than January 2013 through April 2017, Rubbo and Monaco, in the offer or sale of securities by use of the means or instruments of transportation or communication

in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud.

39. By reason of the foregoing, Rubbo and Monaco, directly and indirectly have violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### VIOLATIONS OF SECTION 17(a)(2) OF THE SECURITIES ACT
### (Against Monaco)

40. The Commission repeats and realleges Paragraphs 1 through 36 of this Complaint as if fully set forth herein.

41. From no later than January 2013 through April 2017, Monaco, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

42. By reason of the foregoing, Monaco directly and indirectly has violated, and unless enjoined, is reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT III

### VIOLATIONS OF SECTION 17(a)(3) OF THE SECURITIES ACT
### (Against Rubbo and Monaco)

43. The Commission repeats and realleges Paragraphs 1 through 36 of this Complaint as if fully set forth herein.

44. From no later than January 2013 through April 2017, Rubbo and Monaco, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, directly or indirectly negligently engaged in transactions, practices and courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers.

45. By reason of the foregoing, Rubbo and Monaco, directly and indirectly, have violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT IV
### VIOLATIONS OF SECTION 10(b) AND RULE 10b-5(a) OF THE EXCHANGE ACT
### (Against Rubbo and Monaco)

46. The Commission repeats and realleges Paragraphs 1 through 36 of this Complaint as if fully set forth herein.

47. From no later than January 2013 through April 2017, Rubbo and Monaco, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails in connection with the purchase or sale of securities, knowingly or recklessly employed devices, schemes or artifices to defraud.

48. By reason of the foregoing, Rubbo and Monaco directly and indirectly violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a), thereunder.

## COUNT V
### VIOLATIONS OF SECTION 10(b) AND RULE 10b-5(b) OF THE EXCHANGE ACT
### (Against Monaco)

49. The Commission repeats and realleges Paragraphs 1 through 36 of this Complaint as if fully set forth herein.

50. From no later than January 2013 through April 2017, Monaco, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails in connection with the purchase or sale of securities, knowingly or recklessly made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

51. By reason of the foregoing, Monaco directly and indirectly violated, and unless enjoined, is reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(b), 17 C.F.R. § 240.10b-5(b), thereunder.

## COUNT VI
### VIOLATIONS OF SECTION 10(b) AND RULE 10b-5(c) OF THE EXCHANGE ACT
### (Against Rubbo and Monaco)

52. The Commission repeats and realleges Paragraphs 1 through 36 of this Complaint as if fully set forth herein.

53. From no later than January 2013 through April 2017, Rubbo and Monaco, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails in connection with the purchase or sale of securities, knowingly or recklessly engaged in acts, practices and courses of business which operated as a fraud upon the purchasers of such securities.

54. By reason of the foregoing, Rubbo and Monaco directly and indirectly violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c), thereunder.

## COUNT VII
### VIOLATIONS OF SECTION 15(a) OF THE EXCHANGE ACT
### (Against Dykes)

55. The Commission repeats and realleges Paragraphs 1 through 36 of this Complaint as if fully set forth herein.

56. Defendant Dykes made use of the mails and other means or instrumentalities of interstate commerce, to effect transactions in, or to induce or attempt to induce the purchase or sale of securities, without being associated with a broker or dealer that was registered with the Commission in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

57. By reason of the foregoing, Defendant Dykes directly and indirectly violated, and unless enjoined, is reasonably likely to continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## COUNT VIII
### AIDING AND ABETTING VIOLATIONS OF
### SECTION 15(a) OF THE EXCHANGE ACT
### (Against Rubbo and Monaco)

58. The Commission repeats and realleges paragraphs 1 through 36 of this complaint as if fully restated herein.

59. Defendant Dykes acted as broker or dealer and has made use of the mails or any means or instrumentality of interstate commerce to effect transactions in securities, or to induce or attempt to induce the purchase or sale of securities, without being associated with a broker or dealer that was registered with the Commission in accordance with Section 15(b) of the

Exchange Act [15 U.S.C. § 78o(b)] in violation of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

60.     Defendants Rubbo and Monaco, knowingly or recklessly, substantially assisted Defendant Dykes's violations of Section 15(a) of the Exchange Act.  Unless enjoined, Defendants Rubbo and Monaco are reasonably likely to continue to provide substantial assistance to Dykes's violations.

## VI. RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court find the Defendants committed the violations alleged, and:

### A.

### Permanent Injunctive Relief

Issue a Permanent Injunction restraining and enjoining:  (a) Defendant Rubbo from violating Sections 17(a)(1) and (3) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rules 10b-5(a) and (c); (b) Defendant Monaco from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5; (3) Defendant Dykes from violating Section 15(a) of the Exchange Act; and (4) Defendants Rubbo and Monaco from aiding and abetting Dykes's violations of Section 15(a) of the Exchange Act.

### B.

### Disgorgement with Prejudgment Interest

Issue an Order directing the Defendants to disgorge all ill-gotten profits or proceeds received from investors as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest thereon.

## C.

### Civil Money Penalties

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d).

## D.

### Penny Stock Bars

Issue an Order pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)] barring Defendants from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

## E.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## F.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Dated: November 30, 2017                    Respectfully submitted,

By: *[signature]*

Christine Nestor
Senior Trial Counsel
Florida Bar No. 597211
Direct Dial: (305) 982-6367
E-mail: nestorc@sec.gov

Linda S. Schmidt
Senior Counsel
Florida Bar No. 0156337
Direct Dial: (305) 982-6315
E-mail: schmidtls@sec.gov

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154